BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

*Attorneys for Plaintiff Ryan O'Dell*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RYAN O'DELL, derivatively on behalf of OKTA, INC., <br><br> Plaintiff, <br><br> v. <br><br> TODD MCKINNON, BRETT TIGHE, FREDERIC KERREST, SHELLYE ARCHAMBEAU, ROBERT L. DIXON, JR., PATRICK GRADY, BEN HOROWITZ, REBECCA SAEGER, MICHAEL STANKEY, JEFF EPSTEIN, AND MICHELLE WILSON, <br><br> Defendants, <br><br> and <br><br> OKTA, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> JURY TRIAL DEMANDED |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Ryan O'Dell ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning himself, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes a review and analysis of: (a) filings in various proceedings, including a class action lawsuit captioned, *City of Miami Fire Fighters' and Police Officers' Retirement Trust v. Okta, Inc., et al.*, No. 3:22-cv-02990-SI (N.D. Cal.) (the "Securities Action") alleging Okta, Inc. ("Okta" or the "Company") and its executives violated federal securities laws; (b) Okta's filings with the U.S. Securities and Exchange Commission ("SEC"); (c) Okta's press releases, website, corporate governance documents, presentations, and conference calls; and (d) analyst reports and other publicly available information concerning the Company and its Board of Directors (the "Board").

## NATURE OF THE ACTION

1.     This stockholder derivative action is brought on behalf of Okta against certain current and former Okta executives and members of the Company's Board (the "Individual Defendants")[1] for, among other things, breaching their fiduciary duties to Company stockholders by intentionally or recklessly making or permitting the dissemination of false and misleading statements regarding the Company's integration with Auth0, Inc. ("Auth0"), the security breach that Okta experienced in January of 2022 (the "January 2022 Breach"), and the adequacy of the Company's internal controls.

2.     Okta utilizes identity and access management ("IAM") software to provide data security for its customers. In May 2021, Okta acquired Auth0, another data security company, to sustain its previously reported high rate of growth.

3.     From at least September 1, 2021 through September 1, 2022, inclusive (the "Relevant Period"), the Company and the Individual Defendants repeatedly claimed that: (i) the Company's early integration efforts with Auth0 were successful; (ii) the Company retained a sufficient workforce,

---

[1] The Individual Defendants are Todd McKinnon ("McKinnon"), Brett Tighe ("Tighe"), Frederic Kerrest ("Kerrest"), Shellye Archambeau ("Archambeau"), Robert L. Dixon, Jr. ("Dixon"), Patrick Grady ("Grady"), Ben Horowitz ("Horowitz"), Rebecca Saeger ("Saeger"), Michael Stankey ("Stankey"), Jeff Epstein ("Epstein"), and Michelle Wilson ("Wilson").

including key Auth0 and Okta employees; (iii) the Company was adhering to appropriate standards for protecting sensitive information; (iv) the Company was protected from and not the subject of a data breach; and (v) the Company maintained adequate internal controls. The Individual Defendants' representations, however, were false.

4.      Almost immediately after the acquisition, the Company began experiencing serious issues with integration, including the loss of senior Auth0 employees and key Okta employees. Retention of key Auth0 employees was critical to success of the integration, including because Okta and Auth0 offered different products. The Individual Defendants, however, withheld this information from shareholders and the public, stating repeatedly that the integration was going as planned.

5.      In January 2022, Okta experienced a significant security breach, which the Individual Defendants knowingly or recklessly failed to disclose until two months later, and only after the hackers took credit for the breach on their blog. In response to the hacker's blog post, Defendant McKinnon confirmed that there had been a breach and that the Company had known about it since January 2022. On this news, the Company's stock price declined $2.98 per share to close at $166.43 on March 22, 2022 and fell another $17.88 per share, or 10.74%, to close at $148.55 on March 23, 2022.

6.      On August 31, 2022, the full truth emerged when the Individual Defendants finally disclosed the serious issues the Company was experiencing with the Auth0 integration during an earnings call, with Defendants McKinnon and Tighe announcing the Company would reevaluate its growth targets as a result of the integration issues. On this news, Okta's stock price fell overnight by $22.25 per share, or over 24.3%, to open at $69.15 on September 1, 2022, and fell an additional $8.55 per share on September 1, 2022.

7.      As a result of the foregoing, Okta, Defendants Mckinnon, Tighe, and Kerrest have been named as defendants in the Securities Action (the "Securities Defendants") which alleges investors were damaged when they purchased Okta shares from September 1, 2021 to September 1, 2022.

8.      As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the costs of defending and paying class-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

wide damages in the Securities Action, as well as additional losses, including reputational harm and loss of goodwill.

9.     Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act. Demand is excused because each member of the Board faces a substantial likelihood of liability for the misconduct alleged herein.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of § 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b) because nominal defendant Okta is incorporated in this District and conducts business in this District.

## THE PARTIES

*Plaintiff*

15.     Plaintiff currently holds shares of Okta common stock and has been a continuous holder at all relevant times.

*Nominal Defendant*

16.     Okta is a Delaware Corporation with its principal executive offices located at 100 First Street, Suite 600, San Francisco, California 94105.

*The Individual Defendants*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17.     Defendant Todd McKinnon co-founded Okta and has served as the Company's Chief Executive Officer ("CEO") and as a member of the Board since January 2009. McKinnon previously served as Chairperson of the Board. Prior to working at Okta, McKinnon worked alongside Defendant Kerrest at salesforce.com, inc.

18.     Defendant Brett Tighe has served as the Company's Chief Financial Officer ("CFO") since January 2022, but Tighe served as the Company's interim CFO from June 2021 until his appointment as permanent CFO.

19.     Defendant Frederic Kerrest co-founded Okta and has served as the Company's Chief Operating Officer ("COO") and as a member of the Board since July 2009. Kerrest became the Executive Vice Chairperson of the Board in March 2019 and has served in that position throughout the Relevant Period. Prior to working at Okta, Kerrest worked alongside Defendant McKinnon at salesforce.com, inc.

20.     Defendant Shellye Archambeau has been a director of the Company since December 2018. Archambeau is a member of the Company's Audit Committee and served as the Chairperson of the Audit Committee until May of 2021.

21.     Defendant Robert L. Dixon, Jr. has been a director of the Company since June 2019. Dixon also serves on the Compensation Committee.

22.     Defendant Patrick Grady has been a director of the Company since May 2014. Grady is a member of the Audit Committee.

23.     Defendant Ben Horowitz has been a director of the Company since February 2010. Horowitz serves as Lead Independent director.

24.     Defendant Rebecca Saeger has been a director of the Company since January 2019. Saeger serves on the Compensation Committee and the Nominating Committee.

25.     Defendant Michael Stankey has been a director of the Company since December 2016. Stankey serves on the Nominating Committee and as the Chairperson of the Compensation Committee.

26.     Defendant Jeff Epstein has served as a director of the Company and as Chairperson of the Audit Committee since May 2021.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27.     Defendant Michelle Wilson was a director of the Company from August 2015 until April 2022. Wilson served on the Compensation Committee and as Chairperson of the Nominating Committee.

## **DEFENDANTS' FIDUCIARY DUTIES**

28.     By reason of their positions as officers, directors, and/or fiduciaries of Okta and because of their ability to control the business and corporate affairs of Okta, the Individual Defendants owed Okta and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

29.     The Individual Defendants were and are required to act in furtherance of the best interests of Okta and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interest or benefit.

30.     Each director and officer of the Company owes to Okta and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

31.     The officers and directors of Okta were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

32.      Each Individual Defendant, under his/her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. To discharge their duties, officers and directors of Okta were required to, among other things:

    a.  Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with all applicable district, state, and federal laws rules, regulations, and requirements, and pursuant to Okta's Code of Conduct and internal guidelines;

    b.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to provide the highest quality performance of its business;

    c.  Exercise good faith to ensure that the Company's communications with the public and

with shareholders are made with due candor in a timely and complete fashion;

d.  Maintain and implement and adequate system of internal legal, financial, and management controls to ensure that Okta's operations would comply with all laws and that Okta's regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

e.  Refrain from unduly benefitting themselves and other Company insiders at the expense of the Company; and

f.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to rectify the misconduct and prevent its recurrence.

33.    The Individual Defendants had a duty to prevent the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings and business prospect. As fiduciaries, the Individual Defendants had a duty to disclose in regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

34.    The Individual Defendants, because of their position of authority as directors and/or officers of Okta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations

of law, including breaches of fiduciary duty and unjust enrichment.

37.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

38.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Okta, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

39.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

40.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of Okta and at all times acted within the course and scope of such agency.

**OKTA'S CODE OF BUSINESS CONDUCT**

41.     Okta's Code of Conduct states that "Everyone at Okta – including directors, officers employees and contractors of Okta, Inc. and its subsidiaries – is required to read, understand and follow the letter and spirit of the Code . . . ." The Code of Conduct provides that "failure to comply with the Code or our other policies and guidelines may result in disciplinary action, up to and including termination of your relationship with Okta."

42.     The Code of Conduct provides, in pertinent part, that:

> Our vision is to accelerate a world where everyone can safely use any technology, and safeguarding the identities of our customers' workforces and users is of utmost importance. Trust is at the core of this responsibility, so it follows that acting with integrity and transparency are guiding principles for how we work with each other, our customers, our partners and extended community.

*     *     *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**We maintain financial integrity, and accurate records and accounting**

The integrity, reliability and accuracy in all material respects of Okta's books, records and financial statements are fundamental to our continued business success. You must accurately and truthfully document each business transaction. You may not cause Okta to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, you may not create any false or artificial documentation or book entry for any transaction entered into by Okta. Similarly, officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets, liabilities and transactions on Okta's books and records. If you are notified that the documents in your possession are relevant to an anticipated or pending litigation, investigation or audit, follow the guidelines set forth in the notification and do not alter or conceal any documents covered by the notification.

**We comply with applicable laws, rules and regulations**

We strive to conduct our business in compliance with all applicable laws, rules and regulations in all of the countries in which we conduct business. You may not engage in any unlawful activity in conducting Okta's business or in performing your day-to-day company duties, nor should you instruct others to do so. You are obligated to conduct business ethically and to use good judgment. If you have questions about the legal requirements in a particular country, you should contact the Compliance Officer, or his or her designee, to ensure compliance with local laws and Okta's policies.

*     *     *

**We safeguard data privacy**

We make commitments to protect customer data, personal data, confidential information and the systems that process such data. All personnel are expected to follow global privacy laws, secure, access, use and share personal data only in accordance with the law and our policies, and honor individuals' choices with respect to their personal and confidential data. Failure to comply with the law and our policies for confidential and personal data can result in significant liability for us and loss of trust from our customers. Examples of personal data and private communications data may include:

- o Individually identifying health information
- o Family members' names
- o Employee ID or government ID number
- o Contact information such as email addresses or telephone numbers
- o Credit card or personal financial account information
- o IP addresses/device IDs
- o Customer message detail records
- o Customer email communications
- o Call or video recordings or transcriptions For more information, review the training and policies applicable to your situation linked on our Privacy & Product Legal page

**We communicate appropriately**

Our commitment to building and maintaining a strong reputation and brand means that

all information disseminated outside of Okta (for example, to the media, investors or the general public) must be accurate, complete and consistent. To that end, all inquiries from the media and industry analysts must be directed to our Public Relations team, and all inquiries from investors or the investment community must be directed to our Investor Relations team. You should never discuss Okta with the media, investors or analysts unless you have been explicitly authorized to do so by the Public Relations team or the Investor Relations team. You also must obtain approval from your manager and the Public Relations team before accepting any public speaking engagement where you will discuss Okta, its products or services, or your role.

Additionally, responses to inquiries from a government agency must be truthful and provide accurate information. Upon receiving this type of request, you must reach out to our Government Affairs team and the Compliance Officer, or his or her designee, before responding.

Our Social Media Policy provides more guidance on discussing Okta online. We should be thoughtful in our online communications and ensure that we:

- o Do not disclose any confidential information or trade secrets.
- o Do not comment on legal matters.
- o If discussing the company or Okta products, be transparent about your relationship with the company and be clear that your statements are your own opinion, not those of the company.
- o Do not post anything that might be viewed as a threat, harassment or bullying.
- o Do not post anything that may be perceived as disrespectful to our customers, clients, suppliers, partners or competitors.

**Administration and waivers**

Our Board of Directors (the "Board") has established the standards in the Code and, directly or through its Audit Committee, oversees its compliance. The Board has delegated day-to-day responsibility for administering and interpreting the Code to our General Counsel, who is designated as the Code's "Compliance Officer."

It is rare for anyone to be exempted from any part of the Code, regardless of seniority or position. Any waiver of any provision of the Code for a director, executive officer or senior financial officer must be approved by the Board or the Audit Committee, and promptly disclosed as required by applicable law and stock exchange rules. Waivers of the Code for other employees or contractors must be approved by the Compliance Officer, the Board or the Audit Committee. For the avoidance of doubt, manager pre-approval of outside business activities as described in Section 3 does not constitute a waiver under the Code.

Note that the Code is a statement of certain fundamental principles, policies and procedures that govern you in the conduct of Okta's business, and is not intended to and does not create any rights in any employee, customer, client, visitor, supplier, competitor, stockholder, or any other person or entity.

### OKTA'S AUDIT COMMITTEE CHARTER

43.    Okta's Audit Committee Charter states that:

The primary purpose of the Committee shall be to act on behalf of the Board in

fulfilling the Board's oversight responsibilities with respect to (i) the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports, (ii) the selection, engagement terms, fees, qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"), (iii) review any reports or other disclosure required by the applicable rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein and (iv) the performance of the Company's internal audit function ("Internal Audit").

44.     The Committee's functions and responsibilities include:

***Quarterly Results and Reports on Form 10-Q.*** To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements and any disclosure from the Company's CEO and CFO to be made in connection with the certification of the Company's quarterly reports filed with the SEC prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB. To review with management and the Auditors, to the extent appropriate, other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required in Item 601(b)(31) of Regulation S-K and relevant reports rendered by the Auditors (or summaries thereof).

***Management's Discussion and Analysis.*** To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

***Press Releases.*** To review with management and the Auditors, to the extent appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made.

\*        \*        \*

***Risk Assessment and Management.*** To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to financial risk management and financial risk assessment, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

\*        \*        \*

**Ethical Compliance.** At least annually, to review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure

adherence to applicable laws, rules and regulations, as well as to its Code of Conduct, including review and oversight of related party transactions as required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock is listed.

## SUBSTANTIVE ALLEGATIONS

45.     The amended complaint in the Securities Action detailed the accounts of nine former employees of Okta and/or Auth0 who are referred to herein as FE 1 – FE 9. These former employees, who corroborate many of the allegations in both this action and the Securities Action, provided information on a confidential basis and with sufficient detail to establish their reliability and personal knowledge.

46.     As detailed herein, the Individual Defendants intentionally or recklessly made or permitted others to make false and misleading statements and failed to disclose that: (i) the Company's early integration efforts with Auth0 were unsuccessful; (ii) the Company had not retained a sufficient workforce, including key Auth0 and Okta employees during the integration; (iii) the Company was not adhering to appropriate standards for protecting sensitive information; (iv) the Company was not protected from and, indeed, was the subject of a data breach; and (v) the Company had not maintained adequate internal controls.

47.     Okta is a data security company co-founded in 2009 by Defendants McKinnon and Kerrest. The Company offers a platform that allows its clients to securely access their networks, data, and applications for employees, customers, and partners with the use of IAM software. Okta's products include Adaptive Multi-Factor Authentication ("MFA"), lifecycle management software, allowing for the provisioning and de-provisioning of users, and Simple Sign-On ("SSO"), which allows users to access several independent software systems with a single ID.

48.     Most of Okta's revenue derives from selling multi-year subscriptions for use of its products. Okta's flagship product, the Okta Identity Cloud, is used by roughly 16,000 customers, including businesses, universities, non-profits, and government agencies, to secure and manage identities around the world.

49.     As a data security company, Okta's ability to maintain customer trust and protect its customers from security breaches was integral to its success. Additionally, as a growth-based

company with no revenue, the Company and the Individual Defendants held out year-over-year growth as a significant metric of its success.

50.     In May of 2021, Okta acquired Auth0 to sustain the high growth rates the Company was reporting. While Okta primarily provided IAM software, designed to protect clients' internal, employee information, Auth0 provided customer identity and access management software ("CIAM"), which allows clients to manage and protect external identities (like customers).

51.     Defendant McKinnon described how the acquisition created an opportunity for Okta to accelerate its growth in the identity market during a March 5, 2021 interview with Jim Cramer on *Mad Money*, explaining that 75% of Okta's revenue derives from the $30 billion workforce identity market, whereas only 25% of the Company's revenue derives from the $25 billion customer identity market. McKinnon noted that the acquisition would allow the Company to further expand into the customer identity market.

52.     While the acquisition presented a significant growth opportunity for the Company, successful integration of Auth0 and Okta would have required the retention of Auth0 employees. Shortly after the close of the Auth0 acquisition, the Company began to experience significant integration issues. According to FE 1, just before the acquisition, Okta promoted several of its employees in title above their incoming counterparts from Auth0. FE 1 explained that many senior Auth0 employees were put into positions with less seniority and authority than the positions they held at Auth0, while many other senior Auth0 employees simply departed after the acquisition. The loss of these senior Auth0 employees and underutilization of those who remained led to serious integration issues.

53.     The loss of senior Auth0 employees as well as key Okta employees significantly compromised the integration plan. FE 5 recalled that Susan St. Ledger, the President of Worldwide Field Operations at Okta who arrived shortly before the acquisition, along with Okta Chief Revenue Officer Steve Rowland, "pushed out" the "founding fathers" of Okta as well as several other employees that helped build the Company. FE 5 further explained that as a result of these departures, a number of directors were fired or resigned as well. FE's 5 and 6 recall that these employees were replaced with people who were unfamiliar with Okta's product and with CIAM software, products

and markets. FE 6 explained that Auth0's salespeople had "no clue" about Enterprise or Government sales and that in fall of 2021, after Auth0 was acquired, there was a "mass exodus" of salespeople from the Company.

54.    Defendants were aware of the difficulties that the Company faced regarding integration but concealed that information from the public. On the first day of the Relevant Period, September 1, 2021, Okta issued a press release that quoted Defendant McKinnon stating, "In our first quarter as a combined company with Auth0, we're off to a fantastic start."

55.    During an earnings call held the same day, Defendant McKinnon explained, "It's been less than four months since we closed the acquisition of Auth0, but we've already made a lot of progress and learned quite a bit. Defendant McKinnon further stated, "when you think about us plus Auth0, it is going very well." During that same call, Defendant McKinnon announced the Company's plan to unify the companies' sales teams, so that all the Company's sales representatives would sell both Okta and Auth0 products. McKinnon further acknowledged that the sale of Auth0 products would require specialized expertise:

It's been less than 4 months since we closed the acquisition of Auth0, but we've already made a lot of progress and learned quite a bit.

We've made the decision to accelerate the timeline for integrating the sales organizations under Susan St. Ledger's leadership to the beginning of the new fiscal year in February. This move will allow the unified sales team to sell both platforms and benefits customers by providing more options to meet their unique use cases.

*        *        *

And then, plus the integration is -- the sales integration detail planning is starting now. So we have a lot more work to do at the detail level and then budget communication internally and externally on that. At a high level, it's about growth and it's about taking the entire sales capacity of both organizations, combining them together, and making sure that all of that sales capacity, to some degree, can sell all the products: Okta SIEM, Okta Workforce, Auth0 SIEM. There'll be obviously some specialization and some overlays to get the -- to make sure the transition to this unified Salesforce works and that you get the right technical specialization because especially on the -- both SIEM products require technical specialization and particularly on the Auth0 side, it's a more developer-facing product, which means it has different kind of technical requirements. So there will be specialization there, but the main high-level idea is more sales capacity, more ability to take this big lead we have in this market. And this market, like I mentioned before, is a $30 billion market, and we're by far the biggest vendor in here, but our ACV is only like $330 million. So this is a market that's happening before our eyes, and we're going to go capture it, both from the go-to market, from the branding and positioning of us being the premier identity vendor

from the execution on how we build the products going forward to make sure we're continuing to advance our respective leads in a separate category -- in the respective categories and subcategories.

56.     During the same call, in response to an analyst's question about what the Company was doing to retain essential employees, Defendant McKinnon acknowledged the importance of retaining the Company's employees but failed to disclose that the Company had recently lost senior Auth0 key Okta employees.

57.     Okta's Form 10-Q for the Company's second quarter for fiscal year 2022, filed with the SEC on September 2, 2022, (the "September 2, 2021 10-Q") contained materially false and misleading risk disclosures, including the following with regard to the acquisition of Auth0:

**The acquisition of Auth0 may cause a disruption in our business.**

[T]he acquisition of Auth0 (the "Acquisition") could cause disruptions to our business or business relationships, which could have an adverse impact on results of operations. Parties with which we have business relationships may experience uncertainty as to the future of such relationships and may delay or defer certain business decisions, seek alternative relationships with third parties or seek to alter their present business relationships with us. Parties with whom we otherwise may have sought to establish business relationships may seek alternative relationships with third parties.

*     *     *

The [transition and] . . . integration of Auth0 may place a significant burden on our management and internal resources. The diversion of management's attention away from day-to-day business concerns and any difficulties encountered in the transition and integration process could adversely affect our financial results.

We have incurred and expect to continue to incur significant costs, expenses and fees for professional services and other transaction costs in connection with the Acquisition. We may also incur unanticipated costs in the integration of Auth0's business with our business. The substantial majority of these costs will be non-recurring expenses relating to the Acquisition. We also could be subject to litigation related to the proposed Acquisition, which could result in significant costs and expenses.

**We may not realize potential benefits from the Acquisition because of difficulties related to integration, the achievement of synergies, and other challenges.**

Prior to the consummation of the Acquisition, we and Auth0 operated independently, and there can be no assurances that our businesses can be combined in a manner that allows for the achievement of substantial benefits. Any integration process may require significant time and resources, and we may not be able to manage the process successfully as our ability to acquire and integrate larger or more complex companies, products or technologies in a successful manner is unproven. If we are not able to successfully integrate Auth0's businesses with ours or pursue our customer and product strategy successfully, the anticipated benefits of the Acquisition may not be realized fully or may take longer than expected to be realized. **Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers,**

**disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated.**

(Last emphasis added.)

58.     These statements were reproduced verbatim in Okta's 10-Q filed with the SEC on December 2, 2021 (the "December 2, 2021 10-Q") and again on Okta's 10-Q filed with the SEC on June 3, 2022 (the "June 3, 2022 10-Q").

59.     The statement indicating the mere possibility that "there could be a loss of [Okta's] and/or Auth0's key employees," is false and misleading because this had already happened, and Defendants knew and specifically withheld that fact.

60.     On September 14, 2021, during the Piper Sandler Global Technology Conference, Defendant Kerrest discussed the integration of Auth0, and knowingly or recklessly failed to disclose materially relevant facts, including the loss of Okta and Auth0 employees who were critical to the success of the integration.

**[Robbie David Owens**
**Piper Sandler & Co., Research Division]**

Absolutely. Maybe more so on a tactical level, what should investors think about over the next year as it's integrated in? And I think you recently announced sales integration building in some cushion relative to how you're bringing the sales force together. So help us understand just what to look for and potential benchmarks as you move forward with this integration?

**[Jacques Frederic Kerrest**
**Co-Founder, Executive Vice Chairperson & COO]**

Yes, absolutely. So the integration has gone very well. We're about 4 months in. We're pretty good at execution. So we had some pretty good goals for ourselves, but I think we've been beating even those, which is great.

61.     The Company continued to experience significant integration issues throughout the Relevant Period. According to FE 2, who was "intimately involved" with the integration process, the integration was executed "very, very poorly" and was a "complete nightmare." FE 2 recalled that the integration plan involved retaining Auth0 employees as "specialists," and selling only Auth0 products for one year while training Okta employees on those products. FE 2 recalls that the integration plan was "ripped out" at the "eleventh hour." According to FE 2, the finance team determined that the integration plan was not "humanly possible" for FY2024 and "completely shut it down." FE 2 further

16

explained that rather than retaining Auth0 employees as "specialists," Auth0 employees were expected to sell Okta products and *vice versa*. FE 2 continued to explain that neither Okta employees nor Auth0 employees had any experience with each other's products and received no education or training.

62.    As the Company was failing to meet its integration plans, Okta and the Individual Defendants announced the Company's results for the third quarter of fiscal year 2022, and on December 1, 2021, issued a press release quoting Defendant McKinnon, stating "We're maintaining the momentum of both Okta and Auth0 and are making great progress on the integration." During an earnings call held the same day, Defendants Kerrest and McKinnon continued to portray the integration process as seamless and promising, failing to disclose the loss of key Auth0 and Okta employees and the fact that neither Okta nor Auth0 employees had any knowledge of each other's products:

> **[Jacques Frederic Kerrest:]**
>
> Yes. Absolutely. We do have a lot on our plate, and that's an exciting place to be, frankly. And that's the kind of problem we like to have. We are doing very well in the integration efforts. Obviously, when it comes to the back office, that's in really great shape. When it comes to a lot of the upsell, cross-sell motion, we got that figured out very quickly, as we highlighted. And now another key piece of the puzzle, as you just mentioned, is the sales forces. They will be fully integrated come Feb 1, which is 2 short months from now when we kick off the new fiscal year. It'll all be under one umbrella. We're already doing -- as you can imagine, you don't just flip the switch when you have the size of the sales force as ours, especially how fast it's growing. We already are doing a lot of work around territory management, around education, around getting all the new folks ramped on now the broader suite of products that they're going to have to offer. But it's going very well.
>
> *    *    *
>
> **[Todd McKinnon:]**
>
> We're in the midst of our strategic and financial planning process right now. And as you mentioned, there's all kinds of things we could do or things people want to do. One thing that's been very clear through the whole thing, the #1 priority by far is executing on the customer identity access management opportunity. So making sure that over the next 12, 18, 24 months, we do an amazing job of winning and expanding our lead in that market. And a big part of that is integrating Auth0, and we're off to a great start. And a big milestone comes, as Freddy mentioned, on Feb 1 when the sales teams are fully integrated. But it's very -- everyone at Okta knows that's the clear priority. We have to execute well on that, and we have to extend our lead in that market. And then that really bodes well for anything else after that we want to do.

Winning the SIEM market is going to set the stage for that.

63.     These statements were false and misleading because they failed to disclose the loss of senior Auth0 and key Okta employees and that, as a result, the Company no longer had a team of specialized staff for Auth0 products and could not efficiently integrate. Further, the Individual Defendants withheld the fact that Okta and Auth0 employees were forced to sell each other products without any knowledge of or experience with those products.

64.     Integration issues at Okta persisted, as the Company's decision to unify the sales teams without proper training was further hindered by constant departures of Auth0 employees. FE 5 recalls that "maybe 20%" of sales representatives met their quotas and that there was a "mass exodus" of employees, further characterizing the acquisition of Auth0 as a "shitshow." On March 2, 2022, during the Company's earnings call, an analyst inquired about the unified sales team. In response, despite the sales force struggling to sell both companies' products and the "mass exodus" of Auth0 employees, Defendants Kerrest and McKinnon continued to minimize the Company's integration issues:

**[Jacques Frederic Kerrest:]**

We are very excited about the integration of Auth0. We're very excited that it's been done in just under a year from where we are because we actually announced the acquisition a year ago tomorrow.

As -- to start with, I think the most important point is the go-to-market organization, which we unified under Susan's leadership on February 1. You heard Todd talk about one team, which I think is a great position to be in. We've put together a lot of the core systems that we're using to run the business. Those are all running on one platform.

So we have one pane of glass and good visibility into all that and how it's working. There's a couple more pieces we need to finish up in terms of ticking and tying some of the systems on the back end, but those are just making sure that we're working as one organization going forward.

65.     Defendant McKinnon made similar claims regarding the integration effort during that same earnings call:

What we're getting is we're getting synergy on the -- really on the sales side. So we have -- all of the Okta reps now can sell all the products. So we increased the capacity.

We can -- we increased what they can actually sell. So there's tons of upside from that. But Eugenio has a big job to do with the Auth0 product unit, driving that. They just delivered -- you heard the results.

They delivered over 80% growth, and we expect them to produce a lot in the year ahead.

66.     These statements were false and misleading because the Individual Defendants again failed to disclose the loss of senior Auth0 and key Okta employees and that, as a result, the Company no longer had a team of specialized staff for Auth0 products. Defendants also withheld the fact that Okta and Auth0 employees were forced to sell each other products without any knowledge of or experience with those products.

67.     On June 2, 2022, an analyst questioned Defendant McKinnon regarding the sales integration process with Auth0 during Okta's earnings call as follows:

**Jonathan Frank Ho William Blair & Company L.L.C.,
Research Division - Technology Analyst**

I just wanted to, I guess, maybe start out with trying to understand, I guess, your sales integration process. How has that gone? And can you give us a sense of maybe some of the incremental opportunities that have come out of that?

**Todd McKinnon Okta, Inc. - Co-Founder, Chairman & CEO**

Yes. Jonathan, it's nice to see you. We just celebrated the 1-year anniversary of joining forces with Auth0, which is great. And as we've said in the past, the key here is keeping the momentum going in both Okta and Auth0. Both businesses were doing very well, and that's the continued focus. **We've made a lot of progress as a combined company.** Many parts of the back office functions were integrated over the course of FY'22, which is great. **And we started Q1 with the combination of go to -- combining the go-to-market organizations.**

I think there's no real finish line when it comes to integrations. But I think we're really focused on addressing this massive customer identity access management market in a way that, frankly, no other vendor can in terms of independence and neutrality, we have the only 2 modern public cloud solutions and certainly no in-house IT can. **So I think we've made great progress. There's still a little bit to do, but we're in good shape.**

68.     Defendant Tighe similarly touted the progress of the sales team integration during that call:

And any integration or acquisition and integration of 2 companies, the sales integration is one of the biggest milestones there are. And for this integration between Auth0 and Okta, 2 great sales teams being brought together, it's no different, right? It was a great milestone for us. It was a big one for us, and we're pleased with the progress, thus far.

69.     At the time when they issued these statements, the Individual Defendants knew or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

were reckless in not knowing that as a result of the loss of senior Auth0 and key Okta employees, the Company no longer had a team of specialized staff for Auth0 products. Further, Defendants withheld the fact that Okta and Auth0 employees were forced to sell each other products without any knowledge of or experience with those products.

70.    Okta and the Individual Defendants failed to properly protect customer information despite how critical it was to the Company to do so. FE 6 explained the Company's "SuperUser" tool that permitted customer support employees and pre-sale engineers to monitor and control customer tenants. FE 6 explained that customer "tenants" referred to customers' space within Amazon Web Services and stated that the SuperUser tool provided access to any Okta tenant anywhere in the world. FE 6 further explained that the only restrictions for the SuperUser were related to HIPAA compliance for healthcare-related accounts and described normal commercial accounts as the "wild west."

71.    FE 6 explained that, when she was at Okta, there was no official vetting process for granting SuperUser access and that it was determined purely by managers' discretion. FE 6 recalled that while some of the more experienced managers tended to grant access more carefully, the newer managers "handed it out like candy."

72.    FE 6 indicated that Okta did not employ proper safeguards with respect to its SuperUser tool. FE 6 explained that typically, employees would only have access to such a powerful tool from a secure administrative station, rather than from their home laptop, because a designated administrative station could be guarded more closely and alert people when compromised. FE 6 suggested that, alternatively, the Company should have employed heightened security protocols for home laptops, equipping them with technology that could cause an application to shut down or obscure sensitive information if it detected an intruder. FE 6 indicated that such safeguards are "best practice" in the industry and characterized Okta as a "10-year-old startup," lacking discipline with respect to its security controls.

73.    Moreover, Okta failed to require third parties, including sub-processors and Solutions Engineers, to adhere to the Company's own fundamental security requirements. For instance, Okta adopted "Zero Trust" security architecture. According to Okta's website, "Zero Trust security throws away the idea that we should have a 'trusted' internal network and an 'untrusted' external network.

The adoption of mobile and cloud means that we can no longer have a network perimeter-centric view of security; instead, we need to securely enable access for the various users (employees, partners, contractors, etc.) regardless of their location, device or network." Okta obviously also promotes its IAM solutions to its customers for the safeguarding of identity information. However, Okta never required its sub-processors to confirm that they comply with either of these security requirements.

74.     On October 13, 2021, Okta issued a press release, entitled "Okta Advances Customer Identity with Auth0 and New Okta Features" (the "October 13, 2021 Press Release") which quoted Okta's Vice President of Cloud Infrastructure, Atul Bahl, stating:

> As a data-focused organization, security is of the utmost importance to us. Okta's Custom Administrator Roles allow us to follow the principle of least privilege and only grant admins access to the tasks they need to perform across our many business units. We save time for our internal teams and ensure the best-in-class security of our customer applications.

75.     These statements were false and misleading, omitting the highly material facts that Okta was not properly safeguarding its administrative tools and that Okta failed to require its sub-processors to comply with the Company's own security protocols.

76.     As a direct result of these inadequacies, on January 21, 2022, hackers known as LAPSUS$ were able to access Okta resources to view information from the Company's active customer tenants after compromising one of the Company's third-party support vendors, Sykes, a subsidiary of Sitel.

77.     Despite their knowledge of the January 2022 Breach, the Individual Defendants failed to disclose that data breach for another two months, and they only did so after LAPSUS$ posted evidence on their blog.

78.     On March 7, 2022, the Company filed its Form 10-K with the SEC, reporting its financial results for fiscal year 2022 (the "2022 10-K"). The filing was signed by Defendants McKinnon, Tighe, Kerrest, Archambeau, Dixon, Epstein, Grady, Horowitz, Saeger, and Stankey, and it contained highly misleading risk disclosures:

> ***Security is a mission-critical issue for Okta and for our customers.*** Our approach to security spans day-to-day operational practices from the design and

development of our software to how customer data is segmented and secured within our multi-tenant platform. ***We ensure that access to our platform is securely delegated across an organization.*** Okta's source code is updated weekly, and there are audited and verifiable security checkpoints to ensure source code fidelity and continuous security review. We have attained multiple SOC 2 Type II Attestations, CSA Star Level 2 Attestation, ISO/IEC 27001:2013, ISO/IEC 27018:2019 and Health Insurance Portability and Accountability Act ("HIPAA") certifications and multiple agency Federal Risk and Authorization Management Program ("FedRAMP") Moderate Authorities to Operate. We also support FIPS 140-2 validated encryption in our Okta Verify MFA product.

Scalability and Uptime

Our technical operations and engineering teams are designed around the concept of an always-on, highly redundant and available platform that we can upgrade without customer disruption. Our products and architecture were built entirely in and for the cloud with availability and scalability at the center of the design and were built to be agnostic with respect to the underlying infrastructure. Our maintenance windows do not require any downtime.

Okta's proprietary cell architecture includes redundant, active-active availability zones with cross-continental disaster recovery centers, real-time database replication and geo-distributed storage. If one of our systems goes down, another is quickly promoted. Our architecture is designed to scale both vertically by increasing the size of the application tiers and horizontally by adding new geo-distributed cells.

***The Okta Identity Cloud is monitored not only at the infrastructure level but also at the application and third-party integration level. Synthetic transaction monitoring allows our technical operations team to detect and resolve issues proactively.***

*     *     *

This risk factor summary contains a high-level summary of risks associated with our business. It does not contain all of the information that may be important to you, and you should read this risk factor summary together with the more detailed discussion of risks and uncertainties set forth following this summary A summary of our risks includes, but is not limited to, the following: . . .

- Adverse general economic and market conditions and reductions in workforce identity and customer identity spending may reduce demand for our products, which could harm our revenue, results of operations and cash flows.

- We have experienced rapid growth in recent periods, which makes it difficult to forecast our revenue and evaluate our business and future prospects.

- Our recent growth rates may not be indicative of our future growth. As our costs increase, we may not be able to generate sufficient revenue to achieve and, if achieved, maintain profitability.

- We have a history of losses, and we expect to incur losses for the foreseeable future.

- If we fail to manage our growth effectively, we may be unable to execute our business plan, maintain high levels of service and customer satisfaction or adequately address competitive challenges. . . .

- Our business depends on our customers renewing their subscriptions and purchasing additional licenses or subscriptions from us. Any material decline in our Dollar-Based Net Retention Rate would harm our future results of operations.

- Customer growth could fall below expectations.

- We may experience quarterly fluctuations in our results of operations due to a number of factors that make our future results difficult to predict and could cause our results of operations to fall below analyst or investor expectations.

- There are risks related to our ability to successfully integrate Auth0 and realize potential benefits from the acquisition. . . .

- An application, data security or network incident may allow unauthorized access to our systems or data or our customers' data, disable access to our service, harm our reputation, create additional liability and adversely impact our financial results.

- Any actual or perceived failure by us to comply with the privacy or security provisions of our privacy policy, our contracts and/or legal or regulatory requirements could result in proceedings, actions or penalties against us.

\*   \*   \*

**Risks Related to the Acquisition of Auth0**

***The ongoing integration of Auth0 may cause a disruption in our business.*** (Emphasis in original.)

  ***The ongoing integration following the acquisition of Auth0 (the "Acquisition") could cause disruptions to our business or business relationships, which could have an adverse impact on results of operations.*** Parties with which we have business relationships may experience uncertainty as to the future of such relationships and may delay or defer certain business decisions, seek alternative relationships with third parties or seek to alter their present business relationships with us. Parties with whom we otherwise may have sought to establish business relationships may seek alternative relationships with third parties.

  ***The ongoing integration of Auth0 may place a significant burden on our management and internal resources.*** The diversion of management's attention away from day-to-day business concerns and any difficulties encountered in the integration process could adversely affect our financial results.

  We have incurred and expect to continue to incur significant costs, expenses and fees for professional services and other transaction costs in connection with the Acquisition. ***We may also incur unanticipated costs in the integration of Auth0's***

*business with our business*. The substantial majority of these costs will be non-recurring expenses relating to the Acquisition. We also could be subject to litigation related to the Acquisition, which could result in significant costs and expenses.

**We may not realize potential benefits from the Acquisition because of difficulties related to integration, the achievement of synergies, and other challenges.** (Emphasis in original.)

Prior to the consummation of the Acquisition, we and Auth0 operated independently, *and there can be no assurances that our businesses can be combined in a manner that allows for the achievement of substantial benefits. The ongoing integration process may require significant time and resources, and we may not be able to manage the process successfully as our ability to acquire and integrate larger or more complex companies, products or technologies in a successful manner is unproven. If we are not able to successfully integrate Auth0's businesses with ours or pursue our customer and product strategy successfully, the anticipated benefits of the Acquisition may not be realized fully or may take longer than expected to be realized. Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers, disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated.* Specifically, the following issues, among others, must be addressed in combining Auth0's operations with ours in order to realize the anticipated benefits of the Acquisition:

- combining the companies' corporate functions;

- combining Auth0's business with our business in a manner that permits us to achieve the synergies anticipated to result from the Acquisition, the failure of which would result in the anticipated benefits of the Acquisition not being realized in the timeframe currently anticipated or at all;

- maintaining existing agreements with customers, distributors, providers, talent and vendors and avoiding delays in entering into new agreements with prospective customers, distributors, providers, talent and vendors;

- determining whether and how to address possible differences in corporate cultures and management philosophies;

- integrating the companies' administrative and information technology infrastructure;

- developing products and technology that allow value to be unlocked in the future; and

- evaluating and forecasting the financial impact of the Acquisition transaction.

**In addition, at times the attention of certain members of our management and resources may be focused on integration of the businesses of the two companies and diverted from day-to-day business operations, which may disrupt our ongoing business and the business of the combined company.**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> ***We may incur significant, non-recurring costs in connection with the Acquisition and integrating the operations of Okta and Auth0, including costs to maintain employee morale and to retain key employees***. Management cannot ensure that the elimination of duplicative costs or the realization of other efficiencies will offset the transaction and integration costs in the long term or at all.

(Emphasis added unless otherwise noted.)

79.     These statements and risk disclosures were materially false and misleading because the risks had already materialized. The Individual Defendants knowingly or recklessly failed to disclose the January 2022 Breach or the fact that Okta had already been experiencing serious issues with the Auth0 integration.

80.     On March 21, 2022, LAPSUS$ posted evidence on their blog of the January 2022 Breach. On March 22, 2022 at 4:23 a.m., Defendant McKinnon published the following statement on his Twitter account:

> In late January 2022, Okta detected an attempt to compromise the account of a third party customer support engineer working for one of our subprocessors. The matter was investigated and contained by the subprocessor. (1 of 2)

> We believe the screenshots shared online are connected to this January event. Based on our investigation to date, there is no evidence of ongoing malicious activity beyond the activity detected in January. (2 of 2)

81.     On this news, Okta's stock price declined $2.98 per share, or 1.76%, to close at $166.43 on March 22, 2022.

82.     Later that day, the Company's Chief Security Officer ("CSO") David Bradbury, published a blog post entitled "Official Okta Statement on LAPSUS$ Claims," admitting that Okta had known about the breach since January. In a follow-up post entitled, "Updated Okta Statement on LAPSUS$," Bradbury confessed that it was "approximately 2.5%" of Okta's customers that had "potentially been impacted and whose data may have been viewed or acted upon."

83.     Following the Company's updated statement, several news outlets began reporting that hundreds of Okta's clients were potentially affected by the January 2022 Breach. For instance, *CNN* published an article on March 23, 2022, entitled "Okta concedes hundreds of clients could be affected by breach," observing that the Company "has over 15,000 customers, according to its website."

84.     Also in response to the news, Raymond James downgraded Okta from "strong buy"

to "market perform," explaining that "[w]hile partners were willing to trust Okta's track record, the handling of its latest security incident adds to our mounting concerns."

85.     As a result of Okta's update after market close, the surrounding media attention, and the Raymond James downgrade, the Company's stock price fell $17.88 per share or 10.74%, to close at $148.55 on March 23, 2022.

86.     The Individual Defendants were or should have been aware of the Company's security vulnerabilities, as the January 2022 Breach was not the first time the Okta had experienced a breach due to the Company's failure to safeguard sensitive information. For example, FE 9 recalled that her boss indicated to her that Okta had been breached several times over the years, and specifically recalls her own personal email, passwords, name and salary information being stolen while working for Okta. FE 9 also recalled an incident in which other employees' information had been compromised, and she explained that she was instructed by both HR and Okta's VP of Cybersecurity Timothy McIntyre to not tell anyone about the incident.

87.     Following the January 2022 Breach, Defendants began to engage in damage control efforts, including public apologies for their lack of transparency and reaching out to hundreds of customers to regain their trust. However, Okta still struggled to acquire new customers due to the reputational damage caused by the January 2022 Breach and the Company's failure to disclose the breach until it was publicly exposed by the hackers.

88.     FE's 3, 4 and 8 independently recalled existing and prospective customers reacting negatively to the data breach.

89.     Despite that Okta was continuing to experience serious issues with the Auth0 integration and now losing sales as a direct result of the breach, Defendants assured the public that the Company had been able to maintain customer trust and was still committed to achieving its growth targets. For example, during a June 8, 2022 interview with Jim Cramer, Defendant McKinnon stated:

> We talked to over 1000 customers face to face over, over video and had these conversations. I personally talked over 400. And got a ton of feedback about what we could do better, how we could make sure that our support environment was not insecure, to make sure that we communicate better, to make sure that we are instill this trust. At the end of the, I think we've been able to do that.

90.     Later, during that same interview, McKinnon continued:

We're committed to making this a $4 billion a year company by fiscal year, fiscal year 26. So, that's, that's coming up quickly. So, we have to invest to grow to that scale and we've always done it with a balance of efficiency. We've always made sure that our, that our growth rate and our [sic] and our cash flow generation was balanced towards that goal. So, we think we're drawing the right balance to capture this market opportunity. And I think over time you're going to see a very highly scaled profitable company that's going to help customers and capitalize on this big market opportunity.

91.     The truth fully emerged on August 31, 2022 when the Individual Defendants finally revealed the Company's severe integration issues during an earnings call. During that call, Defendant McKinnon explained that the Company's financial results were "mixed" due to issues related to integration. Defendant McKinnon specifically stated that Okta "experienced heightened attrition within the go-to-market organization, as well as some confusion in the field, both of which have impacted our business momentum." Defendant McKinnon further explained that Okta employees had struggled to sell Auth0 products and *vice versa*:

Yes, for sure. Thanks for the question. I think there's -- in terms of -- I'll start first with sales organization. The big change on the sales organization was at the beginning of this fiscal year, so Feb 1, and that's where we took the Auth0 sales team that sold as an independent group all through last year for the first three quarters of the -- after the acquisition and we combine them together with the Okta sales team.

And so, **the idea there is that hundreds and hundreds of Okta reps sell the whole portfolio, Okta plus Auth0. And then the Auth0 reps that came over sold the Okta portfolio and Auth0 portfolio. So that was a really significant step in the integration**. In terms of -- one thing I want to clarify is that Freddy doesn't manage the sales team.

*        *        *

**I think the headwinds are really about how do you take those hundreds and hundreds of reps and make them productive selling both customer identity cloud and workforce identity cloud, and there's a couple of things that go into that**. The first thing is that we really have to reach a new buyer for Okta, which is -- Okta traditionally was about CIOs and CISOs. But for customer identity to be successful, we have to reach VPs of technologies, CTOs, all of the chief marketing officers, chief digital officers, the whole suite of C-suite executives that will -- if we win them all and we have an identity platform for all those use cases, we can better achieve our goal of being the primary cloud and the primary piece of their strategic landscape going forward.

(Emphasis added.)

92.     Defendants McKinnon and Tighe also announced that the Company was reevaluating its FY'26 targets, with Tighe adding that the Company would lower its calculated billings "by approximately $140 million due to the outlook headwinds outlined earlier."

93.     On this news, Okta's stock price declined dramatically overnight by $22.25 per share,

27

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

or over 24.3%, to open at $69.15 on September 1, 2022. Over the course of that day, as the market continued to process the news, Okta's stock price dropped by an additional $8.55 per share, or over 12.3%, to close at $60.60 by the close of trading on September 1, 2022.

## DAMAGE TO OKTA

94.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred substantial financial losses, including the costs of defending the Securities Action, as well as additional losses, including reputational harm and loss of goodwill.

## DERIVATIVE ALLEGATIONS

95.     Plaintiff brings this action derivatively for the benefit of Okta to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

96.     Plaintiff will adequately and fairly represent the interests of Okta and its stockholders in enforcing and prosecuting its rights.

97.     Plaintiff is an owner of Okta common stock and has been a continuous shareholder of Company stock at all relevant times.

98.     At the time this action was commenced, the Board consisted of ten directors, namely Defendants McKinnon, Kerrest, Archambeau, Dixon, Grady, Horowitz, Saeger, Stankey, Epstein (the "Director Defendants"), and non-party Emilie Choi. Plaintiff is only required to show that five of the directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all ten current directors, and if not all ten at least the nine Director Defendants, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

99.     A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the ten current directors of Okta, and, if not all ten, the nine

Director Defendants, are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

100.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

101.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

102.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it. For instance, each of the nine director defendants signed the Company's 2022 10-K, which reported Okta's results for fiscal 2022 and which (as alleged herein and in the Securities Action) contained false and misleading statements.

103.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

104.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

105.    Defendants Archambeau, Epstein, and Grady serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal and regulatory compliance, and public disclosure requirements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of, the issuance of material misstatements and

omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

106.    The Director Defendants, as members of the Board, were and are subject to the Company's Codes of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Directors violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

107.    Furthermore, demand, in this case is excused as to all of the Company's current directors because the current directors control the Company and are indebted to each other. The current Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants McKinnon and Kerrest worked alongside each other for years at salesforce.com, inc. prior to serving on Okta's Board together. These conflicts of interest and others preclude the current directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand upon them would be futile. Moreover, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

### COUNT I
### Violations of § 10(b) of the Exchange Act and Rule 10b-5
### Against The Individual Defendants

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

110.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    The Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Okta common stock.

112.    The Individual Defendants acted with scienter because they: (a) knew that the public documents and statements issued or disseminated in the name of Okta were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

113.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Okta, their control over, and/or receipt and/or modification of Okta's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Okta, participated in the fraudulent scheme alleged herein.

114.    As a result of the foregoing, the market price of Okta common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Okta common stock in purchasing Okta common stock at prices that were artificially inflated as a result of these false and misleading statements.

115.    As a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. In addition, as a consequence of their breach of fiduciary duties, the

Individual Defendants have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

### COUNT II
**Breach of Fiduciary Duty**
**Against the Individual Defendants**

116.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

117.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligations of good faith, candor, loyalty, and due care.

118.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

119.    The Individual Defendants breached their fiduciary duties of good faith, candor, loyalty, and due care by making and/or authorizing false and misleading statements concerning the structure of the proposed Conversion.

120.    The Individual Defendants further breached their fiduciary duties to Company shareholders by failing to take remedial action against the other Individual Defendants and by concealing the other Individual Defendants' fraudulent statements and material omissions.

121.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Okta has sustained significant damages as alleged herein. As a result, the Defendants are liable to the Company.

122.    Plaintiff, on behalf of Okta, has no adequate remedy at law.

### COUNT III
**Unjust Enrichment**
**Against the Individual Defendants**

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

124.    By their wrongful acts and omissions, the Individual Defendants were unjustly

enriched at the expense of, and to the detriment of, Okta.

125. The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to Okta.

126. Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

127. As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

128. Plaintiff has no adequate remedy at law.

### COUNT IV
### Aiding and Abetting Breach of Fiduciary Duty
### Against the Individual Defendants

129. Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

130. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

131. Plaintiff has no adequate remedy at law.

### COUNT V
### Waste of Corporate Assets
### Against the Defendants

132. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the

issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

134.    The Individual Defendants wasted corporate assets by, among other things, incurring and paying legal costs to defend the Company and its officers against the Securities Action.

135.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

136.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

137.    Plaintiff, on behalf of Okta, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Okta and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Directing Okta to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Okta and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

1.   strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

2.   strengthening the Company's internal reporting and financial disclosure controls;

3.   developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

4.   strengthening the Company's internal operational control functions.

D.    Awarding to Okta restitution from the Individual Defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 22, 2022

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:      /s/ Rachele Byrd
                    RACHELE R. BYRD

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

**RIGRODSKY LAW, P.A.**
SETH D. RIGRODSKY
TIMOTHY J. MACFALL
VINCENT A. LICATA
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

*Attorneys for Plaintiff Ryan O'Dell*

28944

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Ryan O'Dell, have reviewed the allegation made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true, I further declare that I am a current holder, and have been a holder, of Okta, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _19th_ day of _November_ 2022.

_____
Ryan O'Dell

Scanned with CamScanner