**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

**WEISS LAW**
Joel E. Elkins (SBN 256020)
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone: (310) 208-2800
Facsimile: (310) 209-2348
jelkins@weisslawllp.com

*Co-Lead Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE OKTA, INC. STOCKHOLDER DERIVATIVE LITIGATION | Lead Case No. 3:22-cv-07480-SI |
|  | (Consolidated with Case No. 3:22-cv-08627-SI) |
| This Document Relates To: | **NOTICE OF MOTION AND UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| ALL ACTIONS. | The Hon. Susan Illston |
|  | Hearing Date: August 15, 2025 at 10:00 a.m. |

**TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE that on August 15, 2025, at 10:00 a.m., plaintiffs Ryan O'Dell ("O'Dell") and the LR Trust ("LR Trust") (the "California Federal Plaintiffs") will move before the Honorable Susan Illston, United States District Judge, to grant this Unopposed Motion for Preliminary Approval of Derivative Settlement ("Motion"), which settlement is set forth in the Stipulation and Agreement of Settlement dated June 26, 2025 (the "Stipulation" or "Stip."), and filed concurrently herewith.[1] The Settlement resolves the above-captioned California Federal Action and the following related shareholder Derivative Matters: (1) *Buono v. McKinnon, et al.*, Case No. 1:23-cv-00413-CFC (D. Del.) (the "*Buono* Action"); (2) *Nasr v. McKinnon, et al.*, Case No. 1:24-cv-00106-CFC (D. Del.) (the "*Nasr* Action," and, together with the *Buono* Action, the "Delaware Federal Actions"); (3) *In re Okta, Inc. Stockholder Derivative Litigation.*, C.A. No. 2024-0685-PAF (Del. Ch.) (the "Delaware Chancery Action"); (4) litigation and 8 *Del. C.* § 220 ("Section 220") demands made by Okta, Inc. ("Okta" or the "Company") stockholder Leo Shumacher ("Shumacher"); and (5) a litigation demand made by Okta stockholder Bruce Taylor ("Taylor") (collectively, the "Demanding Stockholders"). The Motion is based on the following Memorandum of Points and Authorities, the Stipulation and exhibits thereto, and such additional evidence or argument as the Court may require.

**STATEMENTS OF ISSUES TO BE DECIDED AND RELIEF SOUGHT**

Whether the proposed Settlement is within the range of possible approval such that the form and means of notice of the Settlement pursuant to the Stipulation should be directed to Current Okta Stockholders and a date for a Settlement Hearing to determine whether to finally approve the Settlement should be set by the Court. California Federal Plaintiffs respectfully request that the Court enter an order preliminarily approving the Settlement, including approving the dissemination of notice of the Settlement pursuant to the Stipulation and setting a date for the Settlement Hearing.

---

[1] The full terms of the Settlement are set forth in the Stipulation. Unless otherwise noted, all capitalized terms have the same definition as set forth in the Stipulation, which is attached as Exhibit 1 to the Declaration of David C. Katz in Support of Unopposed Motion for Preliminary Approval of Derivative Settlement. Additionally, all emphasis herein is added and citations and footnotes are omitted unless otherwise noted.

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3    California Federal Plaintiffs respectfully submit this memorandum in support of the Motion for

4 the Court to preliminarily approve the Settlement. The proposed Settlement resolves shareholder

5 derivative claims brought on behalf of nominal defendant Okta against the Individual Defendants

6 (certain of Okta's current and former directors and officers) in the California Federal Action as well as

7 the Derivative Matters. The Settlement is the product of extensive arm's-length negotiations between

8 the Settling Parties, overseen by mediator David Murphy, Esq. of Phillips ADR Enterprises (the

9 "Mediator"). Stip. § I.B.

10    In connection with the proposed Settlement of the Derivative Matters, Okta has agreed to

11 maintain for at least five years (the "Commitment Term") a comprehensive set of corporate governance

12 reforms (the "Reforms") that will significantly improve Okta's internal controls, policies, processes,

13 and procedures including as to Okta's Board of Directors' ("Board") independence and oversight of

14 risk and public disclosures. Stip. §§ II.A.2.1-2.2. The Reforms include, *inter alia*: (i) improvements to

15 the Company's Insider Trading Policy; (ii) enhancements to the duties and responsibilities of the

16 Company's Disclosure Committee designed to assist the Company both in meeting its disclosure

17 obligations in a timely and accurate manner, and in supporting Okta's Audit Committee in the discharge

18 of its obligations in connection with the Company's quarterly and annual filings with the SEC; (iii)

19 enhancements to the duties and responsibilities of the Audit Committee designed to, *inter alia*, ensure

20 reporting and coordination with the Disclosure Committee; (iv) an acknowledgment that the Derivative

21 Matters were a substantial factor in Okta's decision to establish its Board-level Cybersecurity Risk

22 Committee ("CRC") and to adopt the CRC's current charter on December 14, 2023, as well as certain

23 improvements to the CRC; (v) requirements to ensure timely disclosure of any material cybersecurity

24 incident(s); (vi) codification and enhancement of the Chief Security Officer's ("CSO") duties and

25 responsibilities concerning oversight of assessment and mitigation of Okta's key cybersecurity risks;

26 (vii) codification and enhancement of the Chief Compliance Officer's ("CCO") duties and

27 responsibilities; and (viii) an acknowledgment that the Derivative Matters were a substantial factor in

28

the implementation of certain other Reforms, including amendments to Okta's Corporate Governance Guidelines and Nominating and Corporate Governance and Compensation Committees Charters. *Id.* The Reforms will reduce the risk that Okta and its stockholders will suffer a further loss of investor confidence and legal exposure, enhance Okta's value through better management decision-making and Board oversight thereof, and foster investor confidence in the accuracy of public disclosures, the integrity of Okta's management, and the independence and effectiveness of the Company's corporate governance and Board oversight.

After reaching agreement in principle on the Reforms, the Settling Parties commenced good faith, arm's-length negotiations concerning a fair and reasonable Fee and Expense Amount to be paid to Settling Stockholders' Counsel, which the Mediator oversaw and assisted. Pursuant to a formal, double-blind Mediator's proposal accepted by all Settling Parties, and in recognition of the substantial benefits the Settlement will confer on Okta and its stockholders, Settling Defendants' D&O insurers have agreed to pay to Settling Stockholders' Counsel a Fee and Expense Amount of $2,250,000, subject to Court approval. Okta and the Individual Defendants agree that the Fee and Expense Amount is fair and reasonable in light of the substantial benefits conferred by the Settlement. Stip. § II.A.3.1.

At the preliminary approval stage, the Court need only determine that the proposed Settlement is within the range of what might be found to be fair, reasonable, and adequate, such that notice of the Settlement should be provided to Current Okta Stockholders and a Settlement Hearing scheduled for consideration of final settlement approval. The proposed Settlement plainly meets this standard. In addition, the proposed schedule and form and means of notice of the Settlement are adequate to apprise Current Okta Stockholders of the Settlement's terms and to afford them a fair opportunity to comment on the Settlement. Accordingly, California Federal Plaintiffs respectfully request that the Court enter the proposed Preliminary Approval Order (Exhibit A to the Stipulation, and separately submitted concurrently herewith), which grants preliminary approval of the proposed Settlement, directs that notice be given to Current Okta Stockholders, and schedules a hearing on final settlement approval.

II.    **OVERVIEW OF LITIGATION**

A.    **Summary of the Allegations**

Okta, a data security company incorporated in Delaware, was co-founded in 2009 with the goal of being a market-leader for an identity-based "simple sign-on" authentication that would allow a user to log into several independent software systems with a single ID.  Okta marketed itself as a one-stop solution that provides identity solutions for an organization's workforce and its customers. The Company's flagship platform, the Okta Identity Cloud, enabled clients to securely access their network, data, and applications for customers, employees, and partners.  Since its inception, Okta's focus has been acquiring and retaining customers and increasing customer spending through expanding the number of users who access the Okta Identity Cloud and up-selling additional products. Okta has sold its products directly through its sales teams, and indirectly through a network of channel partners.

Settling Stockholders allege that the Individual Defendants breached their fiduciary duties to Okta and its stockholders by making or causing Okta to make public statements and material omissions concealing the failed integration of an entity acquired by Okta, Auth0 Inc. ("Auth0"), and the failure to implement and monitor internal controls to remedy inadequate data security over customer and employee information resulting, in part, from that failed integration. Settling Stockholders allege these failings led to at least two significant data breach security incidents that exposed customer and employee personal information to hackers.  Settling Stockholders further allege that despite knowing that data security is essential for the success of Okta, the Individual Defendants failed to implement and monitor the internal controls and reporting systems essential to maintaining that security or communicate in a transparent fashion with customers, employees, and stockholders when that security was breached causing damage to Okta.

B.    **Procedural Background**

1.    **The California Federal Action**

On November 28, 2022, plaintiff O'Dell filed the first action comprising the California Federal Action derivatively on behalf of nominal defendant Okta against certain of the Individual Defendants alleging claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

thereunder, and for breach of fiduciary duty, unjust enrichment, aiding and abetting breach of fiduciary duty, and waste of corporate assets under Delaware law. On December 13, 2022, plaintiff LR Trust filed the second action comprising the California Federal Action derivatively on behalf of nominal defendant Okta against certain of the Individual Defendants alleging claims for violations of Section 14(a) of the Exchange Act, and for breach of fiduciary duty, contribution and indemnification, aiding and abetting, and gross mismanagement under Delaware law. On February 22, 2023, the Court granted the parties' stipulation consolidating the two actions into the California Federal Action, appointing Rigrodsky Law, P.A. and Weiss Law as Co-Lead Counsel for plaintiffs, and providing for a stay of the California Federal Action pending resolution of a motion to dismiss in the related securities class action styled *In re Okta, Inc.*, *Sec. Litig.*, No. 3:22-cv-02990-SI (N.D. Ca.) (the "Securities Action"). On March 31, 2023, the Court entered an order granting in part and denying in part the motion to dismiss in the Securities Action.  Thereafter, on May 9, 2023, the Court granted the California Federal Action parties' subsequent stipulation providing for a stay of the California Federal Action through the close of discovery in the Securities Action.

Between March and May, 2024, Defendants produced to plaintiffs in the California Federal Action copies of nearly 2,000 pages of non-privileged, confidential, Company documents that Okta had compiled in response to a Section 220 books and records demand from certain of the Settling Stockholders. Thereafter, the California Federal Action plaintiffs began preparing an amended consolidated complaint, which was not filed because of the settlement discussions.

### 2.  The Related Derivative Matters

On April 14, 2023, the *Buono* Action was filed in the Delaware Federal Court derivatively on behalf of nominal defendant Okta against certain of the Individual Defendants alleging claims for violations of Section 14(a) of the Exchange Act, and for breach of fiduciary duty, and aiding and abetting breach of fiduciary duty under Delaware law.  On May 31, 2023, the Delaware Federal Court granted the parties' stipulation providing for a stay of the *Buono* Action through the close of discovery in the Securities Action. On January 25, 2024, the *Nasr* Action was filed in the Delaware Federal Court derivatively on behalf of nominal defendant Okta against certain of the Individual Defendants alleging

claims for breach of fiduciary duty and unjust enrichment under Delaware law. On March 18, 2024, the Delaware Federal Court stayed the Delaware Federal Actions through the close of discovery in the Securities Action. Between March and May, 2024, Defendants produced to the Delaware Federal Actions plaintiffs copies of the nearly 2,000 pages of non-privileged, confidential, Company documents that Okta had compiled in response to a Section 220 books and records demand from certain of the Settling Stockholders.

On February 2, 2024, Salvatore Grimaldi ("Grimaldi") sent Okta a letter seeking production of books and records pursuant to Section 220. Okta produced to Grimaldi nearly 2,000 pages of responsive documents (the "220 Documents"). On June 25, 2024, utilizing the 220 Documents, Grimaldi filed the first action comprising the Delaware Chancery Action in the Delaware Chancery Court derivatively on behalf of nominal defendant Okta against certain of the Individual Defendants alleging claims for breach of fiduciary duty and unjust enrichment. On July 18, 2024, the Delaware Chancery Court granted the parties' stipulation providing for a stay of the *Grimaldi* Action until the then-pending settlement of the Securities Action was approved or denied by a final, non-appealable order from the Court. On February 28, 2023, Michelle Duprat sent Okta a letter seeking production of books and records pursuant to Section 220. Okta produced to Duprat 1,174 pages of non-privileged, confidential, Company documents pursuant to Section 220. On October 18, 2024, utilizing those confidential documents, Duprat filed the second action comprising the Delaware Chancery Action in the Delaware Chancery Court derivatively on behalf of nominal defendant Okta against certain of the Individual Defendants alleging claims for breach of fiduciary duty and unjust enrichment. On November 8, 2024, the Delaware Chancery Court consolidated the *Grimaldi* and *Duprat* Actions into the Delaware Chancery Action, designating the *Grimaldi* Action complaint as the operative complaint, and providing for a stay of the Delaware Chancery Action until the settlement of the Securities Action was resolved by Court order.

On October 23, 2023, Shumacher sent Okta a letter seeking production of books and records pursuant to Section 220. Okta produced 1,174 pages of non-privileged, confidential, Company documents in response to Shumacher's Section 220 demand. On October 18, 2024, Shumacher sent a

letter to the Board demanding that the Company initiate legal action against its officers and directors for the misconduct alleged in Shumacher's demand letter, which incorporated confidential information gathered from his Section 220 demand. On December 12, 2023, Taylor sent a letter to the Board demanding that the Company initiate legal action against certain of its officers and directors for the misconduct alleged in Taylor's demand letter.

### C. Mediation

The Settling Parties, by and through their attorneys, engaged in good faith, arm's-length discussions regarding the possible settlement of the Derivative Matters. To that end, the Settling Parties agreed to participate in mediation overseen by a nationally recognized Mediator with extensive experience mediating complex shareholder disputes similar to the Derivative Matters who also served as Mediator in the Securities Action. In advance of the March 25, 2024 mediation, after Defendants produced an additional 511 pages of documents, the California Federal Plaintiffs, with the assistance of their expert, Jerry Bessette, Chief Operating Officer of Cyber Defense Labs, provided Okta and the Individual Defendants with: (i) a settlement demand with proposed reforms aimed at strengthening the Company's internal controls and corporate governance practices to prevent recurrence of the alleged misconduct and alleged damage to the Company at issue in the Derivative Matters; (ii) information requests concerning matters that plaintiffs in the California Federal Action viewed as relevant to the Derivative Matters and the reforms being negotiated; and (iii) a detailed mediation statement setting out the alleged misconduct, damages, and arguments in support of their theory of the case. Plaintiffs in the Delaware Federal Actions likewise submitted a detailed mediation statement setting out the alleged misconduct, alleged damages, and arguments in support of their theory of their cases, as well as a settlement demand (which included proposed reforms aimed at strengthening the Company's internal controls and corporate governance practices to prevent recurrence of the alleged damage at issue in the Derivative Matters). While no resolution was reached at the mediation session, progress was made and the parties continued discussing a potential settlement thereafter and engaged in frank discussions regarding the strengths and weaknesses of the claims and defenses at issue, with the Mediator's facilitation and involvement as necessary.

On May 23, 2024, Grimaldi provided Okta and the Individual Defendants with a settlement demand with proposed reforms aimed at strengthening the Company's internal controls and corporate governance practices to prevent recurrence of the alleged damage to the Company at issue in the Derivative Matters, as well as certain information and document requests.

On June 26, 2024, all Settling Parties participated in joint video conference with the Mediator, during which the Settling Parties continued to debate their positions regarding the strengths and weaknesses of the claims and defenses at issue, but no resolution was reached during that conference. Thereafter, the Settling Parties, with the assistance of the Mediator, continued to exchange information, documents, and detailed written settlement proposals and counter-proposals, debating the merits of the proposals in numerous communications between the Settling Parties' Counsel and the Mediator. From July to September 2024, Settling Stockholders' Counsel had numerous discussions with Settling Defendants' Counsel and the Mediator regarding settlement issues and to request additional information. On September 20, 2024, Settling Stockholders' Counsel were provided with information on a confidential basis specifically directed at certain of the issues in the Derivative Matters.

Following further negotiations and the exchange of written proposals, on December 12, 2024, the Settling Parties reached an agreement in principle on the material terms for the Settlement, and thereafter negotiated the terms of a written MOU outlining the material terms and conditions for the release of all claims asserted in the Derivative Matters in consideration for the Company's agreement to adopt, implement, and/or maintain the Reforms. On January 10, 2025, the Settling Parties signed the MOU, which the Settling Parties believe is in the best interests of Okta and Current Okta Stockholders.

After reaching agreement on the principal terms of the Settlement, including executing the MOU, the Settling Parties commenced negotiations facilitated by the Mediator regarding reasonable attorneys' fees and expenses to be paid to Settling Stockholders' Counsel, subject to Court approval, in consideration for the substantial benefits conferred upon Okta and Current Okta Stockholders by the Settlement.  Following the exchange of various proposals, the Settling Parties agreed to a mediation session regarding attorneys' fees and expenses, after which the Mediator made a double-blind

recommendation that was accepted by the Settling Parties on April 14, 2025.  Per that proposal, Defendants' D&O insurers have agreed to pay the Fee and Expense Amount, subject to Court approval.

### III.    TERMS OF THE SETTLEMENT

The proposed Settlement is an excellent result for Okta and its stockholders. Within sixty (60) days after the Court enters a Final Judgment approving the Settlement or at the Board's next regularly scheduled meeting following the entry thereof, whichever is earlier, the Board shall take all necessary and appropriate action to adopt, implement, and maintain for the Commitment Term, the Reforms discussed below. Significantly, the Settling Parties have acknowledged and agreed that the Settling Stockholders' litigation and settlement efforts in the Derivative Matters caused the Board to adopt, implement, and maintain certain of the Reforms, and was a substantial factor in the Board's agreement to adopt certain other Reforms made following the initiation of the Derivative Matters. The Settling Parties have further acknowledged and agreed that the Reforms confer substantial benefits on the Company and Current Okta Stockholders and that the Settlement is in all respects fair, reasonable, and adequate, and serves the best interests of the Company and Current Okta Stockholders.

**A.    Insider Trading Policy**

**i.    Filing**: Okta will file its Insider Trading Policy as an exhibit to its Annual Report (and will include the date of its most recent amendment) and also post its Insider Trading Policy on its Investor Relations website after Okta files the Insider Trading Policy as an exhibit to its Annual Report. Okta will also file its Special Trading Procedures for Designated Persons (referenced in the Insider Trading Policy) ("Trading Procedures") with its Annual Report.

**ii.    Amendments:** Okta's Insider Trading Policy, Rule 10b5-1 Policy, and Trading Procedures, shall, as warranted, be amended as follows:

a.    Okta's Audit Committee, in conjunction with the Chief Legal Officer ("CLO") or her/his designee, will review the Insider Trading Policy annually and amend the Insider Trading Policy as warranted to ensure that it remains up to date with insider trading laws and regulations;

b.    All trades by Directors and Section 16 Officers must be made pursuant to Rule 10b5-1 plans or pre-approved by the CLO or her/his designee;

---

c.       Any proposed Rule 10b5-1 plan or any amendments made to an approved Rule 10b5-1 plan, in each case for Directors or Section 16 Officers, must be approved by the CLO or her/his designee at least forty-five (45) calendar days in advance of any trades thereunder and submitted to Okta's Legal Department for review when no blackout period is in effect;

d.       All Rule 10b5-1 plans must be entered into in good faith by the plan enrollee at a time when said enrollee was not in possession of material non-public information about Okta;

e.       The adoption by any Directors or Section 16 Officers of a Rule 10b5-1 trading plan and its terms, including the aggregate number of shares involved, shall be publicly reported in Okta's Quarterly Reports on SEC Form 10-Q and/or Annual Reports on SEC Form 10-K; and

f.       Any Rule 10b5-1 trading plan shall have a minimum length of six (6) months (subject to earlier completion if all shares under the plan are sold), shall not be subject to cancellation without proper consultation with Okta's CLO or her/his designee, and shall provide that any modification may be made only when no blackout period is in effect, and may not be modified while an insider is in the possession of any material, non-public information.

**B.       Disclosure Committee**

**i.       Amendments:**  Okta will amend its Disclosure Committee charter:

a.       To provide that a Disclosure Committee report will be provided to the Audit Committee on a quarterly basis, including whether there are any concerns regarding disclosure issues;

b.       To provide that "the Disclosure Committee shall have ***full*** access ***to all*** Company books, records, facilities, personnel and employees, ***including independent auditors***, as necessary to perform its role under this charter" (language in bold and italics being added to current charter language);

c.       As warranted, to require that the Disclosure Committee work with the Audit Committee to ensure timely evaluation and accurate public disclosure of material information required to be disclosed in its SEC periodic reports under the Exchange Act, as amended, concerning: (1) integration of any material acquired companies into Okta's operations; (2) actual or expected headcounts, training, promotions, and attrition of Company employees; (3) any material security breaches that occurred or were detected, including such incidents' impact on Okta; (4) material information regarding Okta's

cybersecurity risk management, strategy, and governance; (5) Okta's actual financial results and any material known trends, demands, commitments, events or uncertainties; and (6) the efficacy of Okta's internal controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act).

**ii.    Record Keeping:**  The Disclosure Committee shall maintain records of each regular or other meeting of the Disclosure Committee, including minutes and materials for not less than the Commitment Term.

**C.    Audit Committee**

**i.    Procedures**:  The Audit Committee will adopt procedures, including amending its charter, as warranted, that require it to:

a.    Exercise oversight over Okta's internal controls over accounting and financial reporting processes and systems, procedures designed to identify instances of fraud, and Okta's financial statements and reports;

b.    Review draft scripts (*i.e.*, prepared remarks) for earnings calls prior to the earnings call to ensure that the proposed public statements by Okta do not include any untrue statement of a material fact or omit a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading;

c.    Obtain input from management concerning Okta's periodic reporting on: (i) internal controls; (ii) accounting policies; (iii) cybersecurity risk management, strategy, and governance; and (iv) any other material matters required to be disclosed under state and federal securities laws and regulations;

d.    Review and pre-approve Okta's Form 10-Qs and Form 10-Ks prior to filing such reports with the SEC;

e.    Review the Code of Conduct at least annually;

f.    Obtain quarterly updates from the CLO and/or CCO regarding Okta's compliance with applicable laws;

g.      Receive reports on a regular basis (no less than quarterly) through meetings of the Board regarding recent meetings with the CRC and ensure that appropriate disclosures, to the extent required by the Exchange Act, are made in Okta's periodic reports with the SEC concerning these matters;

h.      Coordinate with the CRC in its oversight of the effectiveness of Okta's cybersecurity program, data privacy program and its practices for identifying, assessing and mitigating cybersecurity risks across the Company, including the security of its products, services and information technology environments, including monitoring and analysis of the threat environment, vulnerability assessments, and third-party cybersecurity risks, as well as review, advise on, and make recommendations to the Board, as appropriate, regarding cybersecurity;

i.      Receive updates, at least quarterly from Okta's Internal Audit and Legal teams; and

j.      Have at least one (1) member that is a "financial expert" as defined by the SEC.

**ii.      Transcript Review:** Okta's Investor Relations group will review transcripts of each earnings call with financial analysts and investors and will review related financial analyst reports and, as appropriate, summarize themes and sentiment to Okta's management and the Audit Committee.

**D.      Cybersecurity Risk Committee:**  Okta will add the CRC and its members to the chart showing the composition of Board committees on the Investor Relations portion of Okta's website. The CRC will adopt procedures, including amending its charter as warranted, that require it to:

i.      Meet as often as it determines is appropriate to carry out its responsibilities, but shall meet at least on a quarterly basis, and maintain written minutes regarding the substance of those meetings.  Minutes, when approved, shall be available to the full Board;

ii.      Obtain reports, on at least a quarterly basis (and more frequently if requested by the committee), from Company management, including the CSO, regarding Okta's cybersecurity program, material cybersecurity risks, known cyberattacks, and data protection;

iii.      Report to the Board or consult with the Audit Committee, as appropriate, regarding IT and cybersecurity systems and processes that affect or relate to Okta's internal controls;

iv.      Meet with the CSO at least quarterly and receive reports at least annually, or more frequently as warranted, on (A) the effectiveness of Okta's risk management program related to

cybersecurity and practices for identifying, assessing, and mitigating cybersecurity risks, (B) Okta's controls to prevent, detect, and respond to cybersecurity attacks or incidents, (C) cybersecurity resiliency, including cybersecurity crisis preparedness and incident response plans, and (D) enhancements to Okta's risk management program related to cybersecurity risks, to enable the CRC to provide oversight of assessment, management, and mitigation of Okta's key cybersecurity risks;

v.      Coordinate with members of the Board, as warranted, to review, evaluate, and discuss with Okta's management the quality and effectiveness of Okta's risk management relating to its cybersecurity program, assessment, and exposures and the actions taken by Okta's management to monitor, control, and safeguard against such exposures;

vi.      Review, advise on, and make recommendations to the Board, as appropriate, regarding cybersecurity;

vii.      Provide support to Okta management or the Audit Committee in its oversight of public disclosures concerning cybersecurity risks made by Okta in its SEC periodic reports;

viii.      Review its own performance annually;

ix.      Report as appropriate to the Board; and

x.      Perform any other activities consistent with the CRC's charter, Okta's bylaws, and any other applicable legal or regulatory requirements, as the CRC or the Board deems appropriate.

**E.      Cybersecurity Disclosures**

**i.      Form 8-K**

a.      After discovering a cybersecurity incident, Okta will assess, without unreasonable delay, whether the incident was material.  To assess the materiality of a cybersecurity incident, Okta shall consult with experts and consultants, as warranted, to provide a thorough analysis.

b.      If Okta determines that such an incident was material, Okta will disclose the incident in an SEC Form 8-K within four (4) business days of making the materiality determination.  That disclosure will describe the material aspects of the nature, scope, and timing of the incident, as well as the incident's material impact or reasonably likely material impact (and will disclose if one or more of these required items is not determined or is unavailable at the time of the filing).

c.      If any required information is undetermined or unavailable at the time of filing, Okta will file an amendment to the Form 8-K containing such information within four (4) business days after the Company, without unreasonable delay, determines such information, or within four (4) business days after such information becomes available.

**ii.      Form 10-K** – Okta will disclose in its Annual Report, filed on SEC Form 10-K:

a.      Its processes for assessing, identifying, and managing material risks from cybersecurity threats;

b.      A description of risks, including those resulting from any previous incidents that have materially affected or are reasonably likely to materially affect the Company, including its business strategy, results of operations, or financial condition, and, if so, how;

c.      A description of the Board's oversight of risks from cybersecurity threats, and the committee or subcommittee responsible for oversight of risks from cybersecurity threats and the process for informing the Board and any such committees about such risks; and

d.      A description of management's role in assessing and managing Okta's material risks from cybersecurity threats.

**F.      Chief Security Officer** – The CSO shall meet with the CRC at least quarterly and shall report to the CRC, at least annually, or more frequently as warranted, on the following topics, to enable the CRC to provide oversight of assessment, management, and mitigation of Okta's key cybersecurity risks:

i.      The effectiveness of Okta's cybersecurity program and practices for identifying, assessing, and mitigating cybersecurity risks;

ii.      Okta's controls to prevent, detect, and respond to cybersecurity attacks or incidents;

iii.      Cybersecurity resiliency, including cybersecurity crisis preparedness and incident response plans; and

iv.      Enhancements to Okta's risk management program related to cybersecurity risks.

**G.      Chief Compliance Officer**

i.      The CCO shall provide oversight and support for Okta's global ethics and compliance program.

ii.      The responsibilities of the CCO shall include oversight and administration of Okta's ethics and compliance policies including the Code of Conduct, Anti-Corruption Policy, and Conflict of Interest Policy, collaboration with stakeholders on Okta's global ethics and compliance program, fostering a culture that integrates compliance and ethics into business processes and practices through awareness and training, oversight and management of the Okta reporting hotline, and investigation of potential ethics and compliance concerns.

iii.      The CCO shall update the Audit Committee at least quarterly regarding ethics and compliance matters, or substantive allegations of financial fraud, as warranted.

iv.      The specific responsibilities and duties of Okta's CCO shall include the following:

a.      Evaluating and defining the goals of Okta's ethics and compliance programs in light of trends and changes in laws that may affect Okta;

b.      Reviewing the Code of Conduct at least annually for review and sign-off by the Audit Committee, and monitoring compliance with such principles;

c.      Working with Okta's stakeholders to evaluate potential compliance risk and mitigation efforts and updating the Audit Committee as appropriate;

d.      Overseeing investigations of whistleblower complaints; and

e.      Overseeing various ethics and compliance training.

**H.      Clawback Policy:**  Okta will maintain its Compensation Clawback Policy for at least the duration of the Commitment Term.

**I.      Board Updates:**  Okta's CSO and/or relevant members of management, as appropriate, shall report to the Board or a committee of the Board on a quarterly basis, or more frequently as warranted, regarding material Company developments, including, as appropriate, about: (1) integration of any material acquired companies into Okta's operations; (2) actual or expected headcounts, training, promotions, and attrition of Company employees; (3) any significant cybersecurity breaches that occurred or were detected, including such incidents' perceived impact on Okta; (4) the Company's data

security policies, procedures, controls, and systems, including significant actual or potential vulnerabilities or deficiencies regarding same; (5) the Company's actual or expected financial performance; and (6) the efficacy of Okta's internal controls and procedures.

      **J.**    **Director Independence:**  The Nominating and Corporate Governance Committee shall review its internal processes to enhance the new independent director candidate process. The Nominating and Corporate Governance Committee shall retain an independent search company to assist it in identifying and nominating new directors to the Board and shall identify an objective set of criteria by which to identify and select potential Board candidates.

      Additionally, the Settling Defendants acknowledge that the Derivative Matters and/or Settling Stockholders' litigation and settlement efforts in the Derivative Matters were a substantial factor in implementing the following Reforms: (a) the Board's amendments to the "Corporate Governance Guidelines" on September 14, 2023; (b) the Board's amendments to the Nominating and Corporate Governance Committee Charter on September 14, 2023; (c) the Board's amendments to the Compensation Committee Charter on June 22, 2023; (d) the establishment of the Board-level CRC and the Board's adoption of the CRC Charter on December 14, 2023; and (e) the Board's adoption of the Compensation Clawback Policy on October 2, 2023.

## IV.    <u>LEGAL STANDARDS FOR PRELIMINARY SETTLEMENT APPROVAL</u>

      It is well-settled that "compromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *see also Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 635 (9th Cir. 1982) (recognizing that the "settlement process [is] favored in the law"); *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) ("there is an overriding public interest in settling and quieting litigation"). Settlements are particularly favored "in class actions and other complex cases [such as derivative actions] where substantial judicial resources can be conserved by avoiding formal litigation." *In re NVIDIA Corp. Deriv. Litig.*, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 19, 2008); *see also In re Xoma Corp. Sec. Litig.*, 1992 U.S. Dist. LEXIS 10502, at *3-4 (N.D.

Cal. July 10, 1992) ("The law favors settlement of cases and quieting of litigation, particularly in complex class actions and derivative litigation.").[2]

Rule 23.1 requires the Court to approve any settlement, voluntary dismissal, or compromise of derivative claims. Fed. R. Civ. P. 23.1(c). "Review of a proposed settlement generally proceeds in two stages, a hearing on preliminary approval followed by a final fairness hearing." *True v. Am. Honda Motor Co., Inc.*, 2009 U.S. Dist. LEXIS 29814, at *8-9 (C.D. Cal. Mar. 25, 2009) (citing *Manual for Complex Litigation*, §21.632 (4th ed. 2004) ("*Manual*")). While the Settling Stockholders believe that the Settlement merits final approval, the Court need only *preliminarily* approve the Settlement at this time. At the preliminary approval stage, the Court's review of the proposed Settlement is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625; *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

This is a low threshold, requiring the Court to determine only "whether a proposed settlement is within the range of possible approval and that notice should be sent to" stockholders. *True*, 2009 U.S. Dist. LEXIS 29814, at *8-9; *see also Manual* at §13.14 ("First, the [court] reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing. If so, the final decision on approval is made after the hearing.").[3] Where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, ... and falls within the range of possible approval, preliminary approval is granted." *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). Plaintiffs respectfully submit that the Settlement is well "within the range" of possible approval and should therefore be preliminarily approved.

---

[2] *See also Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of shareholder derivative actions are particularly favored because such litigation is notoriously difficult and unpredictable.").

[3] *See also Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982) (purpose of preliminary approval hearing is "to ascertain whether there is ***any reason*** to notify the class members of the proposed settlement and to proceed with a fairness hearing").

## V.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A.  Great Weight Should Be Attributed to the Settling Parties' Belief that the Settlement Is Fair and Reasonable

As a threshold matter, the Settling Parties believe that the proposed Settlement represents a fair, reasonable, beneficial, and practical resolution of highly uncertain and complex litigation, and that its terms fairly account for the risks and potential rewards of the claims. As the Ninth Circuit recognized, significant weight should be attributed to parties' belief that litigation should be settled on proposed terms, since "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *see In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 1992 U.S. Dist. LEXIS 14337, at *8 (C.D. Cal. June 10, 1992) (finding belief of counsel that proposed settlement was best result for the class to be compelling factor in approving settlement); *Clark v. Ecolab Inc.*, 2010 U.S. Dist. LEXIS 47036, at *17-18 (S.D.N.Y. May 11, 2010) ("'Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment, for that of the parties who negotiated the settlement.'") (alteration in original); *In re NeuStar, Inc. Sec. Litig.*, 2015 WL 8484438, at *4 (E.D. Va. Dec. 8, 2015) (where plaintiffs' counsel are "'nationally recognized members of the securities litigation bar,'" the Court "may pay heed to [Plaintiffs'] Counsel's judgment in approving, negotiating, and entering into a putative settlement").

Okta has determined that the Settlement confers substantial benefits on the Company and Current Okta Stockholders and that is in the best interests of the Company and its stockholders. Stip. § II.A.2.1. Okta acknowledges that the Derivative Matters caused the Board's agreement to adopt, implement, and maintain the Reforms (*id.*) and was a substantial factor in the Board's agreement to adopt the Reforms made following the initiation of the Derivative Matters set forth in paragraph 2.3 of the Stipulation. *Id.*, ¶ 2.3; *see Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981); *Brooks v. Am. Exp. Indus., Inc.*, 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) ("The Court is of the view that in this case, the decision of the AEI board to approve this settlement is appropriately afforded certain deference; it is a business judgment with presumptive validity.").

In sum, this unanimous agreement that the Settlement, including each of its terms, is in the best interests of Okta and its stockholders is compelling and supports preliminary approval.

**B.  The Settlement Is the Product of Arm's-Length Negotiations**

The Settlement was achieved through significant arm's-length negotiations by well-informed counsel. Where "the Court finds that the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex ... litigation, the Settlement will enjoy a presumption of fairness." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000); *see also Villanueva v. Morpho Detection, Inc.*, 2015 U. S. Dist. LEXIS 106183, at *14 (N.D. Cal. Aug. 12, 2015) (same); *First Capital Holdings*, 1992 U.S. Dist. LEXIS 14337, at *8 (same). Here, the Settlement was negotiated between experienced counsel possessing a firm understanding of the strengths and weaknesses of the claims and defenses asserted, is the product of significant give and take by the Settling Parties, and was reached after extensive negotiations between the Settling Parties and their respective counsel. *See* Stip. §§I.B-D.

The assistance of the neutral, well-respected Mediator provides further assurances that the Settlement was reached fairly. *See* Stip. § I.B; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement ... helps to ensure that the proceedings were free of collusion and undue pressure"); *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1370 (N.D. Ga. 2019) ("mediation with an experienced mediator ... further confirms that the process was procedurally sound and not collusive").

Each of the Settling Parties was represented by zealous and able counsel with extensive experience in complex derivative litigation, and who were well-informed about the legal and factual issues presented. Settling Stockholders and Settling Stockholders' Counsel conducted extensive research and investigation into the Individual Defendants' alleged misconduct and the corresponding alleged damages to the Company. This investigation included, *inter alia*: (i) reviewing Okta's press releases, public statements, SEC filings, and securities analysts' reports and advisories about the Company; (ii) reviewing public filings, media reports, and analyst commentaries about the Company and its technologies; (iii) researching the applicable law with respect to the claims asserted in the

Derivative Matters and the potential defenses thereto; (iv) reviewing and analyzing the Company's Corporate Governance Guidelines and Code of Conduct and the charters of all Board committees; (v) reviewing and analyzing the pleadings and other papers filed in the Securities Action, and evaluating the merits of, and the Individual Defendants' liability in connection with, the Securities Action and the Derivative Matters; (vi) reviewing and evaluating nearly 2,000 pages of confidential, internal Okta documents that were produced in response to certain Settling Stockholders' Section 220 demands; (vii) preparing and filing derivative complaints, preparing a draft amended complaint in the California Federal Action, and preparing and serving the litigation and Section 220 demands in the Derivative Matters; (viii) reviewing the Company's existing corporate governance policies and preparing extensive settlement demands detailing proposed corporate governance reforms to strengthen the Company's internal controls and corporate governance practices; (ix) the California Federal Action plaintiffs' retention of, and consultations with, a qualified expert to assist them in understanding the technical matters at issue, preparing detailed internal control and corporate governance reforms and information requests; (x) preparing mediation statements; (xi) participating in the full-day, in-person mediation session and substantive, protracted settlement discussions with Settling Defendants' Counsel under the auspices of the Mediator; (xii) reviewing and analyzing confidential information provided in the context of mediation; and (xiii) negotiating the MOU and the Stipulation. Stip. § I.C.

The accumulation of the information discovered through the above efforts permitted Settling Stockholders and Settling Stockholders' Counsel to be well-informed about the strengths and weaknesses of the derivative claims and to engage in effective settlement negotiations with Defendants.

## C. The Settlement Is Well Within the Range of Possible Approval

In determining whether to approve a shareholder derivative settlement, "[t]he principal factor ... is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (omission in original); *see In re Apple Comput., Inc., Deriv. Litig.*, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) ("principal factor to consider … is the benefit to [the real party in interest] as compared to the risks posed by derivative litigation"). "Strong corporate governance is fundamental to the economic well-

being and success of a corporation[;]" accordingly, courts have long "recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies." *In re NVIDIA Corp. Deriv. Litig*, 2009 U.S. Dist. LEXIS 24973, at *11-12 (N.D. Cal. Mar. 18, 2009); *see also Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 395 (1970) ("[A] corporation may receive a 'substantial benefit' from a derivative suit ... regardless of whether the benefit is pecuniary in nature."); *Maher*, 714 F.2d at 461 ("[T]he effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor.").

Courts, thus, approve settlements based on corporate governance reforms "specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005). Such reforms make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators or prosecutors." *Id.*; *see In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving settlement where reforms "significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have … caused … harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005) (non-monetary "relief [that] is intended to prevent future harm" supports settlement).

Here, as discussed above, the Reforms achieved in the Settlement confer substantial benefits on Okta and Current Okta Stockholders. These Reforms will help: (i) reduce the risk that Okta and its stockholders will suffer the consequences of a further loss of investor confidence and legal/regulatory exposure by materially improving the Company's internal controls and oversight regime, public disclosures, and other business practices; (ii) enhance the value of the Company through better management decisions and improve the Company's business prospects; and (iii) foster investor confidence in the accuracy of the Company's public disclosures, the integrity of its management, and the independence and effectiveness of the Company's corporate governance and Board oversight. Okta has agreed, subject to the terms of the Stipulation, to maintain the Reforms for a minimum of five years—a meaningful amount of time intended to ensure the Reforms become embedded in the

Company's policies, practices, and corporate culture, thus protecting against discontinuation of these Reforms following the five-year period. Stip. § II.A.2.2; *see also, e.g.*, *Cohn*, 375 F. Supp. 2d at 850 (finding that corporate governance measures that must be in place for no less than three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

Yet, any evaluation of the benefits of a proposed settlement must be tempered by recognition that any compromise involves concessions by all parties. Indeed, "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." *Officers for Justice*, 688 F.2d at 624. "[T]he odds of winning [a] derivative lawsuit [a]re extremely small." *Pac. Enters*, 47 F.3d at 378; *Cohn*, 375 F. Supp. 2d at 852; *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973). Demand futility under Delaware law, in particular, presents a significant pleadings-stage hurdle for derivative plaintiffs. *See* Delaware Chancery Court Rule 23.1 ("The complaint shall … allege ***with particularity*** the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors … and the reasons for the plaintiff's failure to obtain the action or for not making the effort."). Indeed, even a conflicted board can wrest control of a derivative claim from a stockholder by establishing a committee of independent directors to investigate the claim and determine whether to prosecute it. *See Zapata*, 430 A.2d at 786 ("We do not think that the interest taint of the board majority is per se a legal bar to the delegation of the board's power to an independent committee composed of disinterested board members. The committee can properly act for the corporation to move to dismiss derivative litigation that is believed to be detrimental to the corporation's best interest.").

Even if Settling Stockholders were able to survive the pleading stage, they would need to secure evidence sufficient to overcome motions for summary judgment predicated on the "business judgment rule," which affords directors the presumption that they acted on an informed basis and in the good faith belief that their actions taken were in the best interest of the company (*see*, *e.g.*, *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 746-47 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)), and the exculpation and indemnification rights granted to directors, absent a demonstration of intentional misconduct and disloyalty. *See* 8 *Del. C.* §102(b)(7) (corporations may exculpate directors from personal liability for damages except where they fail to act in good faith). While Settling Stockholders

believe their claims have merit, the fact is that the claims against all the Individual Defendants rest on circumstantial evidence, and the claims against Okta's outside directors, in particular, center on alleged oversight failures, which may be "the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). Moreover, the discovery required before trial would be exceedingly costly, complex, and time-consuming, as it would encompass an enormous volume of documents, depositions of myriad fact witnesses, and preparation of expert reports and depositions of experts.[4]

The Settlement eliminates these and other risks and costs of continued litigation, including the risk of no recovery for Okta, and it permits the Company to return its full attention to its business and to restoring its reputation among investors and generating value for its stockholders. *See In re AOL Time Warner S'holder Deriv. Litig.,* 2006 WL 2572114, at *5 (S.D.N.Y. Sept. 6, 2006). The substantial benefits of the proposed Settlement, which were only achieved through the Settling Parties' hard-fought negotiations, demonstrate that the Settlement is "fair, reasonable and adequate to all concerned," and "within the range of possible approval." *Officers for Justice*, 688 F.2d at 625; *see also In re Zuora, Inc. Deriv. Litig.*, No. 3:19-cv-5701-SI (N.D. Cal. July 14, 2023) (finding that "the proposed Settlement falls within the range of possible approval criteria, as it provides a beneficial result for [the company] and appears to be the product of serious, informed, non-collusive negotiations overseen by an experienced mediator").

## VI.    NOTICE TO CURRENT OKTA STOCKHOLDERS

California Federal Plaintiffs seek Court approval of the form and manner of the notice of the Settlement to Current Okta Stockholders set forth in the Stipulation and request entry of the Preliminary Approval Order substantially in the form of Exhibit A to the Stipulation, submitted concurrently herewith, which provides: (i) preliminary approval of the Settlement set forth in the Stipulation;

---

[4] The challenges involved in proving damages are equally daunting. *In re Lloyd's Am. Tr. Fund Litig.*, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages … is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable."). And even a victory at trial is no guarantee that the judgment would avoid reversal on appeal. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL 5927988 (9th Cir. June 23, 2010) (evidence insufficient to support jury verdict for stockholders of $277 million).

(ii) approval of the method of providing notice of the proposed Settlement to Current Okta Stockholders; (iii) approval of the form of Notice and Summary Notice attached to the Stipulation as Exhibits B and C, respectively; and (iv) a date for the Settlement Hearing. Stip. § II.A.4. Federal Rule of Civil Procedure 23.1 requires "[n]otice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed R. Civ. P. 23.1(c). The rule provides courts with discretion, in considering circumstances of a particular case, to determine the manner for provision of notice. *Maher*, 714 F.2d at 450-51.

The Stipulation provides that within ten (10) business days after the Court enters the Preliminary Approval Order, Okta shall provide notice to Current Okta Stockholders by: (i) posting the copy of Long Form Notice and the Stipulation (and exhibits thereto) on the Investor Relations page of Okta's website and maintaining the documents there through the Settlement Hearing; (ii) issuing a press release with the Summary Notice on *GlobeNewswire* with a link to the Company's Investor Relations webpage where the Long Form Notice and Stipulation (and exhibits thereto) will be available; and (iii) filing with the SEC the Long Form Notice and Stipulation (and exhibits thereto) as exhibits to a Form 8-K. Stip. § II.A.4.1.

The proposed Notice describes in plain English the terms and conditions of the proposed Settlement, including: (i) the facts and considerations that led the Settling Parties to conclude that the proposed Settlement is fair, reasonable, adequate, and in Okta's best interests; (ii) the procedure for objecting to the proposed Settlement; and (iii) the date, place, and time of the Settlement Hearing. Stip. Exs. B-C. Given that the proposed Notice and Summary Notice are reasonably calculated to apprise Current Okta Stockholders of the pendency and Settlement of the Derivative Matters and afford them an opportunity to present their objections, if any, the form of the notice program should be approved. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

Moreover, the notice program employed in this Settlement has been widely used in similar shareholder derivative settlements and approved by numerous courts as meeting due process. *See*, *e.g.*,

*Zuora*, No. 3:19-cv-5701-SI (N.D. Cal. July 14, 2023) (notice published on electronic newswire, Form 8-K filing, and posting on company's website); *Allred on behalf of Aclaris Therapeutics, Inc. v. Walker*, 2021 WL 5847405, at *3 (S.D.N.Y. Dec. 9, 2021) (similar); *Moore v. Verb Tech. Co., Inc.*, 2021 WL 11732976, at *7 (C.D. Cal. Mar. 1, 2021) (similar); *In re Rambus Inc. Deriv. Litig.*, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (similar); *In re PMC-Sierra, Inc. Deriv. Litig.*, 2010 U.S. Dist. LEXIS 5818, at *4 (N.D. Cal. Jan. 26, 2010) (similar). Accordingly, the Settling Parties respectfully request that the Court approve the form and manner of Notice as set forth in the Stipulation.

## VII.    PROPOSED SCHEDULE OF EVENTS

As part of the Preliminary Approval Order, the Settling Parties request that the Court establish: (i) the deadline for providing notice of the Settlement to Current Okta Stockholders; (ii) the deadline for Current Okta Stockholders to object to the Settlement; and (iii) the date of the Settlement Hearing. California Federal Plaintiffs propose the following schedule:

| | |
|---|---|
| Notice and Stipulation (including exhibits thereto) attached to Form 8-K or periodic report filed with the SEC and posted on Okta's website, and Summary Notice published in *GlobeNewswire* | Within 10 business days after entry of the Preliminary Approval Order |
| Deadline to file any motions for final approval of the Settlement | At least 21 calendar days before the Settlement Hearing |
| Deadline for Current Okta Stockholders to object to the Settlement | At least 14 calendar days before the Settlement Hearing |
| Deadline for filing any replies to any stockholder objections | At least 7 calendar days before the Settlement Hearing |
| Deadline for Settling Defendants' Counsel to file affidavit or declaration confirming compliance with form, manner, and timeliness of Notice | At least 7 calendar days before the Settlement Hearing |
| Settlement Hearing | At least 45 calendar days after Notice is provided |

This schedule is similar to those used in numerous other shareholder derivative action settlements and provides sufficient due process to Current Okta Stockholders with respect to their rights concerning the proposed Settlement.

## VIII.    CONCLUSION

The Settlement is an excellent result given the risks inherent in the Derivative Matters and the complexity and expense if the Derivative Matters were to proceed. Thus, the Settlement is "within the

range" of what may be approved as fair, reasonable, and adequate, and should be preliminarily approved.

Dated: July 1, 2025                                        Respectfully submitted,

**WEISS LAW**

*/s/ Joel E. Elkins*
JOEL E. ELKINS (SBN 256020)
8383 Wilshire Blvd., Suite 210
Beverly Hills, CA 90211
Telephone:    (310) 208-2800
jelkins@weisslawllp.com

DAVID C. KATZ (*pro hac vice*)
MARK D. SMILOW (*pro hac vice*)
305 Broadway, 7th Floor
New York, NY 10007
Telephone:    (212) 682-3025
dkatz@weisslawllp.com
msmilow@weisslawllp.com

**RIGRODSKY LAW, P.A.**
SETH D. RIGRODSKY
TIMOTHY J. MACFALL
VINCENT A. LICATA (*pro hac vice*)
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

*Co-Lead Counsel for Plaintiffs*